654 F.2d 811
 210 U.S.App.D.C. 96
 OHIO ASSOCIATION OF COMMUNITY ACTION AGENCIES, et al., Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, et al., Respondents,
Northern Natural Gas Company, Southern Natural Gas Company,
Associated Gas Distributors, Interstate Natural Gas
Association of America, Mississippi River Transmission
Corporation, Southern California Gas Company, Public Service
Commission of Wisconsin, Entex, Inc., American Gas
Association, Process Gas Consumers Group, et al., Kennecott
Minerals Company, United Gas Pipe Line Company, United
Distribution Companies, Intervenors.
 No. 80-1208.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 2, 1981.
Decided June 15, 1981.
 
 Edward L. Petrini with whom Charles E. Hill, Washington, D. C. , was on the brief for petitioners. Alan S. Davis, Washington, D. C., also entered an appearance for petitioners.
 Stephen R. Melton, Federal Energy Regulatory Commission, Washington, D. C., with whom Robert R. Nordhaus, Gen. Counsel, Federal Energy Regulatory Commission, Washington, D. C., was on the brief for respondents.
 James J. Flood, Jr., Washington, D. C., with whom Charles J. McClees, Jr., Houston, Tex., was on the brief for intervenor Southern Natural Gas Company presented argument on behalf of all intervenors.
 C. William Cooper, Falmouth, Mass., J. Richard Tiano and John R. Schaefgen, Jr., Washington, D. C., was on the brief for intervenor, United Distributors Company.
 
 
 1
 John A. Myler, Washington, D. C., and Kevin B. Belford, Arlington, Va., were on the brief for intervenor, American Gas Association.
 
 
 2
 Lawrence V. Robertson, Jr., and John H. Cheatham, III, Washington, D. C., were on the brief for intervenor, Interstate Natural Gas Association of America.
 
 
 3
 Before MacKINNON and WALD, Circuit Judges and AUBREY E. ROBINSON, Jr.*, United States District Judge for the District of Columbia.
 
 
 4
 Opinion for the Court filed by Circuit Judge WALD.
 
 INTRODUCTION
 WALD, Circuit Judge:
 
 5
 This case concerns the surcharge to be paid by industrial users of natural gas under the incremental pricing system administered by the Federal Energy Regulatory Commission ("the Commission"). The incremental pricing system is provided for in Title II of the Natural Gas Policy Act of 1978 ("the Act" or "NGPA"), Pub.L.No.95-621, 92 Stat. 3350 (1978), 15 U.S.C. § 3301, et seq. In general, under Title II, interstate pipeline companies are required to pass through portions of their acquisition costs for natural gas to certain industrial users in the form of a surcharge set by the Commission. 15 U.S.C. §§ 3341-48. Title II, however, provides for a ceiling on such surcharges by requiring that the cost of the gas to incrementally priced facilities must not exceed the cost of the designated fuel oil which the industrial user could use as an alternative to natural gas. 15 U.S.C. § 3344.
 
 
 6
 In an unchallenged order the Commission established a three-tier system of surcharges and ruled that the alternative fuel price ceiling for any large industrial facility would be the lowest priced of three designated fuel oils (No. 2 fuel oil, low sulfur No. 6 fuel oil, and high sulfur No. 6 fuel oil) which the facility was legally permitted and technically capable of using.[1] However, in a companion order issued the same day pursuant to section 206(d) of the Act, 15 U.S.C.Sec. 3346(d), the Commission exempted industrial facilities that were legally and technically capable of burning No. 2 oil and low sulfur No. 6 oil from incremental pricing above the level of the price of high sulfur No. 6 oil until November 1, 1980.[2] The impact of the exemption was to delay the effective date of the three-tier pricing system and to set the maximum surcharge at the price of high sulfur No. 6 oil for all industrial users subject to incremental pricing.[3]
 
 
 7
 Petitioners Ohio Association of Community Action Agencies, et al. ("Petitioners") contend that the Commission's exemption order is unauthorized by the Act and that the Commission's action in granting the exemption is arbitrary and capricious and an abuse of discretion. For the reasons stated below we hold that section 206(d) authorizes the Commission to exempt industrial users from the upper two surcharge levels of the Commission's three-tier incremental pricing system and we affirm the order granting the exemption.
 
 I. REGULATORY CONTEXT
 A. Statutory Framework
 
 8
 Title I of NGPA provides for a system of "wellhead" pricing which can be expected to lead to increased natural gas costs for consumers. 15 U.S.C. Sec.s 3311 et seq. Primarily in order to cushion the impact of these increases on residential, small commercial, and other "high priority" consumers of natural gas, Title II of NGPA provides for an "incremental pricing" program. 15 U.S.C. Sec.s 3341 et seq. Sections 201-204 of the Act require that the gas used in certain industrial boiler fuel facilities shall be subject to incremental pricing by means of surcharges as follows: a portion of the acquisition costs of new gas supplies purchased by each interstate pipeline is accounted for separately from all other costs and recovered from industrial users served directly or indirectly (through local distribution companies) by the pipeline. The portion of the acquisition costs "passed through" to industrial users is called "incremental gas costs," and the pass through is accomplished by means of a surcharge on the bills of industrial users subject to incremental pricing. Id.
 
 
 9
 The surcharge on natural gas is limited to the price of the appropriate alternative fuel (oil) as determined by section 204 of the Act. 15 U.S.C. § 3344. If the natural gas surcharge to an industrial facility reaches the level of the applicable ceiling, then the excess incremental gas costs are borne by other industrial facilities to the extent that these facilities are paying less than their alternative fuel costs. 15 U.S.C. § 3344. When the surcharges to all industrial facilities served by the pipeline reach the cost of their alternative fuels, the surcharge operates to maintain the industrial facilities at their alternative fuel costs. Any excess incremental gas costs then may be allocated in whatever manner the pipeline (or local distribution company) is permitted to recover normal costs. Id. Consequently, the alternative fuel cost places a ceiling on the burden that industrial users bear and on the corresponding benefit that high-priority consumers obtain as a result of the incremental pricing surcharge.
 
 
 10
 Three specific provisions of the Act determine the result in this case:
 
 
 11
 (1) Section 204(e)(1) provides, that, in general, the ceiling for incremental pricing in any region is to be the price of No. 2 fuel oil paid in such region by industrial users of the No. 2 fuel oil. 15 U.S.C. § 3344(e)(1).
 
 
 12
 (2) Section 204(e)(2) further provides that the Commission is authorized to reduce, either by rule or order, the alternative fuel ceiling price, regionally by category of user, on a pipeline-by-pipeline basis, or on a case-by-case basis, to an amount no lower than the price of No. 6 fuel oil:
 
 
 13
 if and to the extent the Commission determines ... that such reduction is necessary to prevent increases in the rates and charges of residential, small commercial, and other high-priority users of natural gas which would result from a conversion of such industrial facility or facilities from natural gas to other fuels, which conversion is likely to occur if the level of the appropriate alternative fuel cost were not so reduced.
 
 
 14
 15 U.S.C. § 3344(e)(2).
 
 
 15
 (3) Section 206 authorizes the Commission to exempt facilities from the incremental pricing surcharge. Sections 206(a)-(c) exempt specific facilities from the incremental pricing system: "small existing boiler fuel users," "agricultural users," "schools, hospitals (and similar institutions), and certain other facilities (including electric utilities)." 15 U.S.C. § 3346(a)-(c). In addition, section 206(d)(1) authorizes the Commission to "provide for the exemption, in whole or in part, of any other incrementally priced industrial facility or category thereof." 15 U.S.C. § 3346(d)(1). Section 206(d)(2) provides that when the Commission promulgates an exemption under section 206, the exemption becomes effective thirty days after the exemption is presented to Congress unless either House adopts a resolution of disapproval. 15 U.S.C. § 3346(d)(1).
 
 
 16
 B. The Commission's Incremental Pricing Rules
 
 1. Order No. 50
 
 17
 In order to implement the incremental pricing program mandated by the NGPA the Commission issued a notice of proposed rulemaking,[4] held hearings,[5] and received over 50 written comments.[6] On September 28, 1979 the Commission issued Order No. 50.[7] In the preamble to Order No. 50, the Commission described the "principal issue" as:
 
 
 18
 whether the ceiling on incremental pricing should be set at the price of No. 2 (distillate) fuel oil, or whether statutorily specified conditions are met so that the Commission may exercise its statutory discretion to reduce the ceiling to some level not lower than the price of No. 6 (residual oil).
 
 
 19
 44 Fed.Reg. at 57755 (Order No. 50, at 8).
 
 
 20
 The Commission interpreted section 204(e), which specified the conditions for reduction of the surcharge, to indicate Congressional intent that the alternative fuel price ceiling should be kept at the level of No. 2 fuel oil unless "it is likely that a No. 2 ceiling will result in fuel switching and a shifting of capital costs that would increase residential and commercial rates." 44 Fed.Reg. at 57756 (Order No. 50, at 11). The Commission also believed that Congress did not intend that the ceiling be reduced to the price of No. 6 oil if the lower ceiling would be likely to result in high priority users' rates being higher than they would be with a No. 2 ceiling. 44 Fed.Reg. at 57756 (Order No. 50, at 12).
 
 
 21
 The Commission concluded that the evidence submitted during the course of the rulemaking supported neither a reduction to a uniform No. 2 alternate fuel price nor to a uniform No. 6 price. Id. First the Commission rejected a uniform No. 2 ceiling, finding "that a No. 2 ceiling on incremental pricing would be likely to cause substantial load switching, and the loss of such load would be likely to result in a shifting of capital costs to the disadvantage of high priority consumers." 44 Fed.Reg. at 57758 (Order No. 50, at 24).
 
 
 22
 However, the Commission was unable to conclude that a uniform No. 6 standard would be preferable either. Citing a Department of Energy study, the Commission found that rapid fluctuations in world oil and gas prices made it impossible to predict from month to month whether a uniform No. 6 or a No. 2 ceiling would be more beneficial to high-priority consumers.[8] 44 Fed.Reg. at 57760 (Order No. 50, at 35).
 
 
 23
 Accordingly, the Commission turned to a three-tiered approach so that the ceiling applicable to any particular facility would be high enough to maximize the recovery of incremental costs from the facility, yet would also be low enough to minimize the likelihood that the facility would switch to an alternative fuel. In fact, the Commission found that over-all the three-tier incremental pricing system would maximize the benefits of incremental pricing for high-priority consumers by achieving the maximum flow through of incremental costs to industrial boiler fuel customers without causing undue load loss. 44 Fed.Reg. at 57756, 5770 (Order No. 50, at 12-13, 36). Thus, the three-tier approach met the requirement of section 204(e)(2) for a reduction of the surcharge from the price of No. 2 oil because such a reduction would more likely result in lower rates for high-priority consumers than would an unreduced No. 2 ceiling. 44 Fed.Reg. at 57760 (Order 50, at 36). In addition, if any industrial users continued to pay the No. 2 price under the three-tier system, in theory the high-priority users would be better off than under a uniform No. 6 price.
 
 2. Order No. 51
 
 24
 On the same day that the Commission issued Order No. 50, it issued Order No. 51.[9] Acting under section 206(d) of the NGPA, 15 U.S.C. § 3346(d), the Commission temporarily suspended the effectiveness of the upper two tiers of the three-tier incremental pricing approach adopted by Order No. 50 until November 1, 1980.
 
 
 25
 The Commission explained its apparent about face in terms of arguments that had been advanced by proponents of a single-tier No. 6 ceiling rather than the three-tier system established by Order No. 50:
 
 
 26
 (T)he Commission ... concluded that (the three-tier) system may result in significant investment by facilities in order to install No. 6 capability to gain the advantage of a lower ceiling price for natural gas.... Thus, the Commission is extremely concerned about the three-tier approach becoming effective without more time to gain familiarity with the incremental pricing program, the incrementally priced industrial facilities, and the extent to which the three-tier approach would be likely to result in an inducement to install otherwise unneeded No. 6 oil burning equipment.
 
 
 27
 44 Fed.Reg. at 57778 (Order No. 51, at 2-3).[10] Therefore, the Commission believed it would be in the public interest to hold the upper two tiers of the system in abeyance "to provide a period during which a better understanding of the implications of the three-tier approach can be obtained." Id.
 
 
 28
 In addition to its primary concern about wasteful installation of No. 6 fuel oil capacity, the Commission noted that administrative and enforcement problems associated with immediate implementation of the three-tier program would be alleviated if at the outset, there was a single rather than three-tier price ceiling. Id. These difficulties included the burden on industrial users to file certifications of alternative fuel capability in compliance with the regulations, and the need for the Commission to process these certificates. Id. It was also believed that a postponement of the three-tier system would enable the Energy Information Administration to overcome problems it was experiencing in establishing the data collecting and analysis system which was deemed necessary for the three-tier system. Id.[11] The Commission further expressed the need to determine whether the increased cost and complexity of administration, data collection and enforcement of the three-tier system were worthwhile in terms of increased benefits to high-priority users over those derived from a uniform ceiling at the price of No. 6 oil.[12]
 
 
 29
 After evaluating these concerns the Commission concluded that the implementation of the upper two surcharge ceilings should be postponed until November 1, 1980.[13]
 
 II. THE ISSUE
 
 30
 On this record the Commission makes a persuasive case for waiting to implement the three-tier system. Indeed, we do not readily discern why the Commission could not have properly accomplished the result of Order No. 51 pursuant to its authority under section 204(e) to order a reduction of surcharges. 15 U.S.C. § 3344(e)(2). That is, the Commission might have initially as it in fact did subsequently in a related rulemaking expressed both its concerns about unnecessarily induced investment in No. 6 capacity and the difficulties of administering a three-tier system in terms of the section 204(e) criteria for a reduction in ceiling prices from the level of No. 2 fuel oil, i. e., the need "to prevent increases in the rates and charges to residential, small commercial, and other high-priority users of natural gas." 15 U.S.C. § 3344(e)(2).[14]
 
 
 31
 However, in Order No. 51 the Commission did not rely on its authority to reduce the surcharge but instead adhered to a narrower interpretation of its discretion under section 204(e)(2), believing that section 204
 
 
 32
 is rather specific and it would not be appropriate for the Commission to base a decision on the several wider public policy concerns that are presented ....
 
 
 33
 44 Fed.Reg. at 57781 (Order No. 51, at 20). The Commission felt, however, that it "must be cognizant of such (policy) concerns" and concluded that the exemption provision of section 206(d)(1) provided the mechanism to account for broad policy implications. Consequently, Order No. 51 was promulgated under section 206(d)(1) and transmitted to Congress for review under section 206(d) (2). Neither House of Congress vetoed the exemption and it became effective on December 1, 1979.
 
 
 34
 We need not grapple here with the thorny question of the constitutionality of the one house legislative veto provided for in section 206(d)(2), since we judge the merits of Order No. 51 in its own right, without regard to any possible significance of subsequent Congressional inaction.[15] Thus, we proceed to the core issue of whether the Commission permissibly invoked its section 206(d) exemption power to accomplish an across the board lowering of the alternative fuel prices designated under the Order No. 50 three-tier system.
 
 III. ANALYSIS
 A. Statutory Language
 
 35
 Looking first to the relevant text of the statute, Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976), we find that Order No. 51 is in no way inconsistent with the plain language of section 206(d) or any other part of the Act. Section 206(d), which follows sections 206(a)-(c) listing specific exemptions from incremental pricing, confers upon the Commission in general terms the authority to "provide for the exemption in whole or in part, of any other incrementally priced industrial facility or category thereof ...." 15 U.S.C. § 3346(d) (emphasis supplied). The natural meaning of this language, and in particular the phrases "in whole or in part" and "any other," is that Congress intended the Commission to have broad discretion to issue exemptions in addition to those specifically enumerated in sections 206(a)-(c).[16]
 
 
 36
 Petitioners argue that issuing Order No. 51 as an exemption pursuant to section 206(d) is contrary to other parts of the Act and undermines the incremental pricing scheme enacted by Congress in Title II.[17] In essence, petitioners maintain that Order No. 51 reduces the statutory alternative prices to a uniform price level of high sulfur No. 6 fuel oil, rather than merely granting exemptions from the otherwise applicable surcharges. They argue that by basing Order No. 51 on section 206(d), the Commission is circumventing the restriction in section 204(e), i. e., reductions must be necessary to prevent increased rates to high-priority users and must be allowed on a case-by-case or pipeline-by-pipeline basis.[18] However, this argument finds no support in the text of the Act. The language of section 204(e) does not indicate that it is to be the exclusive mechanism for lowering the alternative price ceiling. Indeed, the very reason for the exemption provision was to lower (or do away with altogether) the surcharge for exempted facilities, and section 206(d) on its face permits incrementally priced facilities to obtain exemptions in whole or in part from the surcharges based on the alternative fuel price ceilings prescribed under Title II. Nowhere else in the Act do we find any other language that undercuts the plain message of the broad exemption authority embodied in section 206(d) or suggests that restrictions governing section 204(e) reductions should be read into section 206(d).
 
 
 37
 Petitioners also invoke familiar rules of statutory construction to argue that the text of section 206(d) does not convey to the Commission the authority to issue Rule No. 51. They contend that section 206(d) contains "words of exception" from a statutory rule (the No. 2 oil price ceiling set by section 204(e)(1)), and thus should be strictly construed. They also rely on the doctrine of ejusdem generis, maintaining that section 206(d) should be read narrowly to limit the exemption power to situations very similar to the specific exemptions contained in sections 206(a)-(c), e. g., small existing industrial boiler fuel users, agricultural users, schools, hospitals, and certain other facilities. However, as is so often the case, these time-worn talismans are not as useful for navigating legislative language as they are for uttering benedictions on conclusions already reached. We find no reason to apply them here where the text and the legislative history of section 206 combine to project a clear Congressional intent to confer a broad exemption authority. See Harrison v. PPG Industries, Inc., 446 U.S. 578, 588-92, 100 S.Ct. 1889, 1895, 64 L.Ed.2d 525 (1980) (refusing to apply ejusdem generis to narrow the phrase "any other final action" because expansive language was clear and a narrow reading unsupported by legislative history); United States v. Powell, 423 U.S. 87, 90-91, 96 S.Ct. 316, 318, 46 L.Ed.2d 228 (1975) (refusing to apply ejusdem generis to narrow phrase "other firearms"), quoting Gooch v. United States, 297 U.S. 124, 128, 56 S.Ct. 395, 397, 80 L.Ed. 522 (1936).
 
 
 38
 But even if we did attempt to apply them, the result would be the same. For example, according to the doctrine of ejusdem generis, when general terms in a statute follow an enumeration of terms with specific meaning, the general terms can be expected to apply to matters similar to those specified. E. g., Harrison v. PPG Industries, Inc., supra. Here, the phrase "other incrementally priced industrial facility" in section 206(d) cannot reasonably mean "any other of the same kind" as the specific exemptions in sections 206(a)-(c) because the exemptions in those three sections are themselves quite disparate and most are not industrial facilities at all.[19] And, even if it is argued that the exemptions in sections 206(a)-(c) share the characteristics of high-priority users, it still does not follow that Congress meant section 206(d) to be limited to other high-priority users, because the words in section 206(d) are "other incrementally priced industrial facility or category thereof" (emphasis supplied) which is something quite different from "high-priority user." When Congress meant to say "high-priority user" elsewhere in the Act, it used those precise words. E. g., 15 U.S.C. §§ 3344(e), 3391(f)(2). Finally, Congress clearly utilized the ejusdem generis principle in section 206(c) which provides exemptions for "any school, hospital or other similar institution " (emphasis supplied). Here it is obvious that Congress meant to restrict the exemption to "other (institutions) of the same kind" as schools and hospitals. The absence of such explicit language in section 206(d) further erodes the foundation for petitioners' argument that section 206(d) is limited to facilities of the same kind as those covered in sections 206(a)-(c). Moreover, petitioners' construction of section 206(d) would make it, to a degree, redundant, i. e., both sections 206(c) and 206(d) would authorize exemptions for users similar to schools and hospitals.
 
 
 39
 In sum, neither petitioners' analysis of the relationship of section 206(d) to the rest of the Act nor its construction of the statutory language compel a reading contrary to the Commission's. Absent a clearly expressed mandate in the legislative history, which we discuss below, we adhere to the obvious meaning of the statutory text. Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); National Small Shipments Traffic Conference, Inc. v. CAB, 618 F.2d 819, 827-28 (D.C.Cir.1980).
 
 B. Legislative History
 
 40
 Our review of the legislative history reveals ample support for the Commission's use of section 206(d) to issue Order No. 51. In the context of the entire Act, a broad exemption power is entirely consistent with the objectives and concerns expressed by Congress during the passage of Title II. Moreover, the portions of the legislative history which specifically refer to section 206(d) indicate an express intent to maximize the Commission's discretion in administering the innovative incremental pricing system.
 
 
 41
 The incremental pricing scheme Congress adopted in the NGPA was novel and experimental, and viewed with some trepidation by many members who feared it would bring in its wake massive switching to nongas fuels, regional dislocations of industry, and a bureaucratic orgy.[20] The proponents of incremental pricing spent much time and energy reassuring their colleagues that in protecting high-priority residential and commercial customers from the higher prices anticipated from wellhead pricing,[21] they would not set in motion counter-productive moves by industry to relocate in gas producing states from gas consuming states or to move toward oil as a substitute fuel. The constant theme they stressed in pushing for the incremental pricing scheme was "flexibility" and "simplicity" in administration and operation.[22] For example, the legislators were very much concerned that the alternate prices that were to constitute the cap on incremental pricing be set promptly to avoid adverse economic consequences, i. e., load loss that might arise from speculation and uncertainty as to what those prices would be.
 
 
 42
 The conferees urge the Commission to take whatever action it deems appropriate or necessary (including expeditious consideration of these proceedings and consolidation of these cases), to avoid any delays in reducing the substitute fuel level so as to avoid the likelihood of conversions from natural gas by industrial users if those conversions would result in increases in natural gas rates for any residential, small commercial, and other high priority customers. The conferees intend that in determining the likelihood of these conversions occurring, the Commission move rapidly in the administrative hearings so as to avoid the irreparable damage which the conferees believe will occur to high priority users if these other industrial users, faced with uncertain natural gas rates, begin taking steps to secure alternate fuel supplies.
 
 
 43
 The conference agreement requires the Commission to make the determination of the cost of alternative fuel following the opportunity for written and oral presentation of views, data, and arguments. The determination is to be based upon a finding that the use of the lower Btu equivalent level is necessary to avoid load shifting that would otherwise result from conversion of incrementally priced industrial facilities to substitute fuels, if that shifting would, in turn, result in increased natural gas rates to high priority users, including residential and small commercial users.
 
 
 44
 Conference Committee Report, H.Rep. No. 95-1752, 95th Cong., 2d Sess. 100 (1978).
 
 
 45
 Congress repeatedly reiterated that it wanted the Commission to have "the requisite discretion to deal with difficulties that may arise"; it intended "that flexibility will be built into the regulations to deal with hardship cases and to prevent industrial relocation"; it recognized "the need to implement incremental pricing in an equitable manner in order to assure that 'the public interest' is best served." E. g., colloquy between Sen. Percy and Sen. Jackson, 124 Cong. Rec. S15220 (daily ed. Sept. 15, 1978).
 
 
 46
 In order to insure that the Commission had this degree of flexibility in formulating alternative fuel prices, Congress supplemented the Commission's discretion under Title II by adding a broad exemption power in section 206(d). As Sen. Jackson explained during the debate on the Conference Committee Report: "(The Commission) has a very flexible mechanism for determining the cost of substitute fuel .... They can set the price anywhere between the cost of No. 2 fuel oil and No. 6 fuel oil. They can recommend an exemption for virtually any facility ... complete or partial ...." 124 Cong. Rec. S16261 (daily ed. Sept. 27, 1978) (emphasis supplied).
 
 
 47
 The Conference Committee Report leaves no doubt on the breadth of section 206(d):
 
 
 48
 The Commission may propose exemptions which exempt any other incrementally priced facility or category thereof either partially or completely. To give the Commission flexibility, the Conferees intend that these other exemptions may deal with either who is covered by the rule or at what level any particular class of users covered by the rule will be incrementally priced. Partial exemptions could be structured to lower the substitute fuel level applicable to any category of users below the levels otherwise provided for in this title. Any proposed exemption is required to be submitted to Congress for review ... Either House of Congress can veto a proposed exemption.
 
 
 49
 H.R.Rep. No. 95-1752, 95th Cong., 2d Sess. 102 (1978) (emphasis supplied). During the Congressional debates statements were also made from which it may be reasonably inferred that the section 206(d) exemption was not to be limited by section 204(e)(2) reduction criteria but instead could be used to accommodate the myriad of concerns raised by legislators about the impacts of incremental pricing, e. g., promoting essential industrial uses and preventing market distortions incident to deregulation.[23]
 
 
 50
 It is also very significant that assurances were given during the final Senate debate on the Conference Committee Report that any industrial user who could show that it would use No. 6 oil, if natural gas were "unavailable," would not be surcharged more than the price of No. 6 oil.[24] Operating under such a clear expression of Congressional intent, the market conditions revealed in the record left the Commission with limited options.
 
 
 51
 One option was to formulate a tiered system under section 204(e) like that in Order No. 50, which set different ceilings according to the user's technological and legal capability to use alternative fuels. This option, however, as we have seen, would be difficult to administer and could be expected to provoke a rash of conversions to equipment capable of firing high sulfur No. 6 oil, with negligible, if any, benefits to the high-priority consumer.[25] Another option would have been to grant individual exemptions under section 206(d) from the otherwise applicable surcharge to any user which showed that it actually would use high sulfur No. 6 oil even if it had to install new equipment to do so. But to insist on individualized processing, including submission to Congress, of all such showings would create a gigantic regulatory headache, as well as provoke a useless waste of resources.[26] We cannot believe that Congress meant to deny the Commission the power to accomplish across the board, as the Commission did in Order No. 51, what would be permissible on an individual basis, at the cost of a vastly expanded regulatory burden and unnecessary capital investment.
 
 
 52
 When all is said and done, it seems to us that the Commission was not forced to sit by and spend countless dollars and manhours setting up three tiers of alternative fuel prices on a monthly basis, an exceedingly difficult exercise in its own right, and process untold numbers of industrial users' applications for the proper certifications of alternative fuel levels, only to have those same users waste money converting to capability of a lower price fuel, with further possible load loss due to the inherent confusion and time lag on setting the prices and reprocessing applications, when in the end the high-priority consumers would not be likely to have any more money in their surcharge fund than they would under Order No. 51.[27] Although we are somewhat perplexed that the Commission could not have factored such considerations into its alternative pricing decision under section 204(e) in the first place, we nonetheless do not find its reliance on section 206(d) to be inappropriate.
 
 
 53
 We believe, in sum, that although Congress laid down fairly strict criteria for reductions under section 204(e) (i. e., a showing that unless a reduction is allowed, industrial load losses will occur to the point that prices for high-priority consumers will be higher in the long run), it nonetheless intended the exemption provision to be used "flexibly" to accomplish other purposes talked about in the legislative history to prevent individual hardship, to protect essential process uses of natural gas, to deter industrial relocations, to introduce a measure of stability in the market, to avoid creating an administrative morass, and to peg the surcharge ceiling for individual users at the price of the alternative fuel they would actually use if gas were not available. Here the blanket exemption provided by Order No. 51 was reasonably calculated to bridge the gap between what users could use alternatively at the present time and what with a small (and useless) expenditure of money they would use in the near future. This is not to say, of course, that the Commission is unbridled in its ability to issue section 206(d) exemptions, but only that this particular exemption passes muster because of its reasonableness and its firm roots in the legislative motives embodied in Title II of the NGPA.[28]
 
 
 54
 Therefore, we conclude that through Order No. 51 the Commission has pursued a reasonable course in a statutorily acceptable manner.
 
 
 55
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(a)
 
 
 [1]
 Regulations Implementing Alternative Fuel Cost Ceilings on Incremental Pricing Under the Natural Gas Policy Act of 1978, Docket No. RM 79-21, Order No. 50, Issued Sept. 28, 1979, 44 Fed.Reg. 57754 (Oct. 5, 1979) (hereinafter Order No. 50)
 
 
 [2]
 Rules Exempting Industrial Boiler Facilities from Incremental Pricing Above the Price of No. 6 Fuel Oil, Docket No. RM 79-21, Order No. 51, Issued Sept. 28, 1979, 44 Fed.Reg. 57778 (Oct. 5, 1979) (hereinafter Order No. 51)
 
 
 [3]
 Because the Commission subsequently foresaw that the problems associated with the three-tier system would not be solved by Nov. 1, 1980, the Commission extended the application of a single-tier, high sulfur No. 6 oil, price ceiling until Oct. 31, 1981. Rule Further Exempting Industrial Boiler Fuel Facilities from Incremental Pricing Above the Price of No. 6 Fuel Oil ..., Docket No. RM 79-21, Order No. 81, Issued May 7, 1980, 45 Fed.Reg. 31300 (May 13, 1980). Presently the Commission is proposing to make the single-tier, high sulfur No. 6 alternative fuel price ceiling permanent, RM 81-27, Notice of Proposed Rulemaking, Issued April 22, 1981, 46 Fed.Reg. 23947 (April 29, 1981)
 
 
 [4]
 Notice of Proposed Rulemaking, RM 79-21, Issued May 11, 1977, 44 Fed.Reg. 29090 (May 19, 1979). Earlier the Commission held several public conferences on the subject of alternative fuel price ceilings
 
 
 [5]
 Hearings were held in St. Paul, Los Angeles, Atlanta, and Washington, D. C. and attended by representatives of state and federal agencies, the natural gas industry, end-users and consumer groups. Administrative Record 1076
 
 
 [6]
 Id
 
 
 [7]
 Note 1 supra
 
 
 [8]
 This is because the amount of revenue in the surcharge fund produced by incremental pricing depends not just on the amount of load loss but also on the current prices paid by the remaining surcharged industrial uses. 44 Fed.Reg. at 57759-60 (Order No. 50, at 29-35)
 
 
 [9]
 Note 2 supra
 
 
 [10]
 There was considerable evidence indicating that unless exemptions were ordered, incrementally priced users would be encouraged to install facilities enabling them to burn the lower price high sulfur fuel oil, solely for the purpose of lowering the surcharge. 44 Fed.Reg. at 57779-81 (Order No. 51, at 9-15). The Commission found that "the record is clear that many firms that currently use No. 2 fuel oil as backup would switch to No. 6." 44 Fed.Reg. at 57780 (Order No. 51, at 12). The Commission further explained:
 A substantial portion of industrial boiler fuel load already has the capability to burn No. 6 fuel oil. If, in response to the three-tier ceiling, there is widespread conversion from No. 2 to No. 6 backup capability, the remaining amount of industrial boiler fuel load which would be eligible to be incrementally priced at the No. 2 level could be reduced to a de minimis amount. In such a situation the surcharge absorption capability captured by having the three-tier approach rather than a single No. 6 ceiling would be sharply reduced. The reduction could be significant enough that the benefits of a three-tier approach to residential and commercial customers would not be substantially greater than they would be if there were a single No. 6 high sulfur ceiling.
 
 
 [44]
 Fed.Reg. at 57780 (Order No. 51, at 14)
 
 
 [11]
 Time and experience have not overcome the difficulties encountered by the Commission and the Energy Information Administration in obtaining the necessary price data. See Notice of Proposed Rulemaking, supra note 3, 46 Fed.Reg. at 23948-49. See also House Comm. on Interstate & Foreign Commerce, "Incremental Pricing of Natural Gas," H.R.Rep.No.96-938, 96th Cong., 2d Sess. 8 (1980) (describing problems of calculating prices for even a single-tier system)
 
 
 [12]
 Several other arguments were voiced in favor of a uniform ceiling at the No. 6 oil price level. The Environmental Protection Agency opposed the three-tier system on the basis that it would cause industries to move from "non-attainment" areas, where they are legally limited by the 1977 Clean Air Act Amendments to using low sulfur No. 6 fuel oil and other cleaner fuels, to "attainment" areas where they would be permitted to use dirtier high sulfur No. 6 fuel oil. EPA also argued that the three-tier system could reduce the incentive for industries to make the environmentally advantageous move from oil to gas. 44 Fed.Reg. at 57781 (Order No. 51, at 17). The Department of Energy supported the three-tier system, although it preferred the single No. 6 oil ceiling, because it would encourage use of natural gas rather than more costly imported oil. Id. (Order No. 51, at 19); 44 Fed.Reg. at 57759 (Order No. 50, at 28). It was further argued that a three-tier ceiling would be discriminatory against smaller plant operators who could not afford to install No. 6 capability. 44 Fed.Reg. at 57762 (Order No. 50, at 41)
 
 
 [13]
 See note 3 supra
 
 
 [14]
 When, as required by section 202 of the NGPA, 15 U.S.C. § 3342, the Commission subsequently issued an order for incrementally pricing natural gas sold to industrial nonboiler facilities, 45 Fed.Reg. 31622 (May 13, 1980) (Docket No. RM 80-10, Order No. 80, Issued May 6, 1980, reprinted in H.R.Rep.No.96-938, supra note 11), it set the alternative fuel price ceiling at the price of high sulfur No. 6 oil. In rejecting the three-tier system established by Order No. 50 in favor of adopting a single-tier system in Order No. 80 the Commission invoked only its authority under section 204(e)(2) to order reductions below the price of No. 2 oil. In justifying Order No. 80, the Commission relied on many of the same concerns it cited in Order No. 51, but expressed them in terms of section 204 criteria, i. e., the need to prevent price increases for high-priority consumers. 45 Fed.Reg. at 31628-29 (H.R.Rep.No.96-938, supra note 11, at 32-38)
 Order No. 80 never became effective because, pursuant to 15 U.S.C. § 3342(c) the order was submitted to Congress and was subsequently disapproved by the House of Representatives. H.R.Res. 655, 96th Cong., 2d Sess., 126 Cong.Rec. H3855 (daily ed. May 20, 1980). The House Committee on Interstate & Foreign Commerce recommended disapproval on the grounds that an expansion of incremental pricing was unwarranted in light of the difficulties experienced in administering the existing incremental pricing system, and because the Committee feared that volatile market conditions might be exacerbated by an extension of incremental pricing at that time. H.R.Rep.No.96-938, supra note 11, at 13-14.
 The recent notice of the Commission's proposal to make the uniform No. 6 oil ceiling of Order No. 51 permanent, see note 3 supra, also contains reasons that suggest a section 204(e) reduction would be warranted. For example:
 (T)he Commission, therefore, is concerned about disparities (between ceilings and actual alternative fuel prices) that might lead to fuel switching and commensurate load loss. Such load loss could result in shifting a higher proportion of fixed system costs to high-priority gas customers, thereby defeating one purpose of the incremental pricing program, the partial shielding of high-priority users from higher natural gas costs.
 ....
 The Commission recognizes that, in the short term, a three-tier system theoretically would maximize the recovery of incremental costs from industrial facilities by maximizing the surcharges absorbed by those facilities. However, it believes that this benefit is outweighed by the problems discussed above. Furthermore, in the long term, the benefit may be illusory, due to fuel switching and installation of unnecessary lower-priced fuel oil burning capability. Accordingly, the Commission is proposing a rule that would establish, on a permanent basis, the current single-tier system, based on the price of high-sulfur No. 6 fuel oil, for all incrementally priced facilities.
 
 
 [44]
 Fed.Reg. at 23948-49
 
 
 [15]
 In light of the controversy over the constitutionality of the so-called one house veto, the Commission understandably does not rely heavily on the absence of a legislative veto to justify Order No. 51. This subject may be addressed imminently by the Supreme Court. See and compare Chadha v. INS, 634 F.2d 408, 429-36 (9th Cir. 1980), cert. pending, 49 U.S.L.W. (docket No. 80-1832, May 1, 1980) (one house veto is unconstitutional); Clark v. Valeo, 559 F.2d 642, 678 (MacKinnon, J., dissenting, unconstitutional), 559 F.2d 642, 648-50 (D.C.Cir.1977) (per curiam, constitutionality not ripe for review), affirmed, 431 U.S. 950, 97 S.Ct. 2667, 53 L.Ed.2d 267 with Atkins v. United States, 556 F.2d 1028, 1057-71 (Ct.Cl.1977), cert. denied, 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (constitutional); Buckley v. Valeo, 424 U.S. 1, 284, 96 S.Ct. 612, 757, 46 L.Ed.2d 659 (1976) (White, J., concurring in part and dissenting in part) (constitutional)
 See also Bruff & Gellhorn, "Congressional Control of Administrative Regulation: A Study of Legislative Vetoes," 90 Harv.L.Rev. 1369, 1373-75 (1977); McGowan, "Congress, Court, and Control of Delegated Power," 77 Colum.L.Rev. 1119, 1133-62 (1977); Gellhorn, Byse & Strauss, Administrative Law (casebook) 119-120 (7th Ed. 1979).
 In the present case, the veto has not been exercised, so the constitutional question may not be ripe for review in any event. Clark v. Valeo, 559 F.2d 642, 650 (D.C.Cir.1977), affirmed, 431 U.S. 950, 97 S.Ct. 2667, 53 L.Ed.2d 267. Cf. McCorkle v. United States, 559 F.2d 1258 (4th Cir. 1977), cert. denied, 434 U.S. 1011, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978).
 
 
 [16]
 We do not believe that this broad language leaves section 206(d) open to the charge that it amounts to an undue delegation of Congressional power. See Yakus v. United States, 321 U.S. 414, 420-25, 64 S.Ct. 660, 665, 88 L.Ed. 834 (1944); United States v. Rock Royal Co-op. Inc., 307 U.S. 533, 561-62, 574-77, 59 S.Ct. 993, 1007, 1013, 83 L.Ed. 1446 (1939); Gellhorn, Byse & Strauss, supra note 15, at 63-64, 79-80, 80 n.5 (sources collected); McGowan, supra, note 15. See also National Small Shipments Traffic Conference, Inc. v. CAB, 618 F.2d 819 (D.C.Cir.1980)
 
 
 [17]
 At oral argument petitioners conceded that the Commission might legitimately have "phased in" the three-tier system, after making the requisite findings under section 204(e), by beginning with a temporary uniform high sulfur No. 6 fuel oil ceiling the first year rather than using the section 206(d) exemption to delay the effective date of the three-tier system. Petitioners also conceded that the Commission might have accomplished the same end result as Order No. 51 by exempting No. 2 and No. 6 facilities on a case-by-case or pipeline-by-pipeline basis
 
 
 [18]
 Petitioners argue that the Commission could not have accomplished Order No. 51 under section 204(e) because reductions can only be made selectively on a case-by-case or pipeline-by-pipeline basis. The Commission does not appear to take direct issue with this view, Brief for Respondent at 17 n.10. However, the language of section 204(e) leaves the existence of such a narrow restriction on reductions subject to debate. In fact, Order No. 80, supra note 14, issued pursuant to section 204(e), contained an across the board reduction to the price of high sulfur No. 6 oil. Resolution of the issue is unnecessary because we decide that restrictions on section 204(e) reductions are not applicable to section 206 exemptions
 
 
 [19]
 Section 206(a) exempts small existing industrial facilities; section 206(b) exempts agricultural users (which include farmers using natural gas for irrigation pumping, a fertilizer plant, or a manufacturer of agricultural chemicals); section 206(c) exempts schools, hospitals, electric utilities, and other similar facilities. Title IV of the Act concerning Natural Gas Curtailment Policies, 15 U.S.C. §§ 3391 et seq., separately defines essential agricultural uses, 15 U.S.C. § 3391(f)(1), and high-priority users, 15 U.S.C. Sec.3391(f)(2)
 
 
 [20]
 The incremental pricing system was one of the most controversial aspects of the Act. Its opponents predicted it would hurt residential customers in the long run, shift industry from gas consuming to gas producing states and be an "administrative nightmare to implement."
 In the House debates on the legislation, see, e. g.,
 Remarks of Rep. Edwards:
 (T)he incremental pricing provisions ... are going to hurt consumers ... will result in great inequities among regions and among customers ... will force many industrial users to switch from using natural gas to other sources of energy, such as residual heating oil. This will have the effect of placing even more of the burden of higher prices on the residential customer, causing more people to switch to oil, and will increase oil demand, oil consumption and oil imports. 124 Cong. Rec. H13125 (daily ed. Oct. 14, 1978).
 Letter of Commission Chairman Curtis to Sen. Jackson, inserted into the record:
 (The draft bill) would be impossible to enforce or administer in a conscientious and equitable manner. (Chairman Curtis supported the final bill.) 124 Cong. Rec. H13127-28 (daily ed. Oct. 14, 1978).
 Remarks of Rep. Stockman:
 (I)nstead of a policy or instead of a coherent approach to the whole gas pricing problem, what we have instead is a jigsaw puzzle that is scrambled into a 66-page statutory box to be shipped down to the Department of Energy where over a period of 7 to 8 years an attempt will be made, in hundreds of rulings and thousands of individual case decisions and thousands of proceedings before State and regulatory bodies all over the country, an effort will be made to put that jigsaw puzzle back together again ....
 ....
 (T)he dual market will be widened and there will be even greater incentives for industrial relocation or dislocation than there is today.... (I)ncremental pricing of gas ... will drive up prices in the North and Northeast to the price of No. 2 oil ... (a)nd ... as in the interstate market ... even higher. 124 Cong. Rec. H13128-29 (daily ed. Oct. 14, 1978).
 Remarks of Rep. Coughlin:
 The cockeyed direction of this legislation is evidenced ... in the incremental pricing provisions which could, figuratively and literally, produce disaster in consuming States .... (T)his bill may help kill off more industry in the beleaguered Northeastern States. It is encouraging industries to relocate to producing states to take advantage of lower gas prices ....
 As for the complexity of the proposed law, it boggles the imagination ... this legislation could well develop into the most costly and tangled bureaucratic morass of all times. 124 Cong. Rec. H13147 (daily ed. Oct. 14, 1978).
 Extension of Remarks of Rep. Stark (inserting Letter from Energy Policy Task Force Chairman White):
 The legislation ... will ... have a catastrophic impact on consumers ....
 (It) would wreak havoc on consumers ....
 Residential customers would be badly hurt ....
 ....
 The complicated pricing scheme ... will be an administrative monstrosity. The Director of Enforcement for (the Commission) calls the measure "complex, ambiguous, and contradictory" and "impossible to administer conscientiously." 124 Cong. Rec. E5326 (daily ed. Oct. 14, 1978).
 See also Remarks of Rep. Brown, 124 Cong. Rec. H13111, 13126; Remarks of Rep. Anderson, 124 Cong. Rec. H13125-26; Remarks of Rep. Collins, 124 Cong. Rec. H13143; Remarks of Rep. Gore, 124 Cong. Rec. H13152 (daily ed. Oct. 14, 1978).
 In the Senate debates on the legislation, see, e. g.,
 Remarks of Sen. Wallop:
 Incremental pricing, a mixed blessing, is one of the most controversial measures in this bill ... (it) would increase our dependence on foreign oil .... (T)he Wyoming result of incremental pricing will be a more expensive and inefficient distributing system. 124 Cong. Rec. S14971 (daily ed. Sept. 12, 1978).
 Colloquy between Sen. Percy and Sen. Jackson, note 22 infra ; Remarks of Sen. Percy, 124 Cong. Rec. S16239 (daily ed. Sept. 27, 1978).
 
 
 [21]
 See, e. g.,
 Remarks of Rep. Dingell:
 (T)he bill's incremental pricing provisions ... will protect residential gas users from sharp price increases. 124 Cong. Rec. H13114 (daily ed. Oct. 14, 1978).
 Remarks of Sen. Byrd:
 The incremental pricing policy ... would protect residential consumers. Increases in the price of gas sold to residences would be borne primarily by low-priority industrial consumers. 124 Cong. Rec. S14596 (daily ed. Aug. 25, 1978).
 Remarks of Sen. Percy:
 The Senate's intention with incremental pricing was to protect the consumer from higher prices. 124 Cong. Rec. S15220 (daily ed. Sept. 15, 1978).
 Remarks of Sen. Heinz:
 (T)he incremental pricing provisions of the bill make sure that the cost of new, more expensive gas will be passed on to industrial users, insulating consumers from the increased expense ... strong incremental pricing language is necessary to protect residential consumers, particularly the elderly, from price increases. 124 Cong. Rec. S15418 (daily ed. Sept. 19, 1978).
 Remarks of Sen. Chiles:
 Residential consumers are shielded from abrupt price increases by incremental pricing provisions and with the resulting increased gas supplies home hook-ups can be resumed throughout the country. 124 Cong. Rec. S15420 (daily ed. Sept. 19, 1978).
 Remarks of Sen. Bumpers:
 (I)ncremental pricing ... is designed or at least calculated to cause industry or at least those industries using natural gas to fire boilers, it is calculated to cause those industries to absorb the bulk of these gas price increases. 124 Cong. Rec. S16235 (daily ed. Sept. 27, 1978).
 
 
 [22]
 Flexibility and ease of administration were recurrent themes throughout the debate on the Conference Committee Report. Witness the colloquy between Sen. Percy and Sen. Jackson, floor manager of the bill:
 Mr. Percy. ....
 What assurances can the administration give, that flexibility can be built into the regulations, to deal with hardship cases and to prevent industrial relocation?
 Mr. Jackson.... The conferees state specifically that they "recognize that implementation of this (incremental pricing) program will be complex. The conference agreement provides for implementation of incremental pricing by rule, which is intended to give the Commission the requisite discretion to deal with difficulties that may arise."
 We certainly intend that flexibility will be built into the regulations to deal with hardship cases and to prevent industrial relocation.
 ....
 Mr. Percy. Critics of the compromise legislation claim that it is just too complex in nature. It would require thousands of lawyers, years in court, millions of dollars, or so I have heard. How can we justify a huge buildup at the very time we are trying to shrink the bureaucracy?
 What is the administration's forecast of the amount of time and money and the number of new employees which will be needed to enforce the provisions ...?
 ....
 Some contend that the combination of incremental pricing provisions and curtailment priorities may drive large industrial gas users to oil. That would increase the demand for imported oil and increase the residential consumers' cost of gas. Both are very serious problems. But we now have the assurance that enough flexibility will be built into the incremental pricing regulations to eliminate those problems. 124 Cong. Rec. S15220-22 (daily ed. Sept. 15, 1978).
 
 
 [23]
 E. g., Rep. Ashley obtained the assurance from Rep. Dingell that the Commission "clearly has the authority to grant exemptions under section 206(d) for essential process uses of natural gas." 124 Cong. Rec. H13237 (daily ed. Oct. 14, 1978)
 Rep. Dingell also explained that incremental pricing is a market ordering device intended to eliminate present-day market distortions prior to deregulation. He described protecting residential gas users (high-priority users) from price increases as "a highly beneficial side effect " of incremental pricing. 124 Cong. Rec. H13114 (daily ed. Oct. 14, 1978) (emphasis supplied). The market ordering function of incremental pricing was also stressed in Rep. Dingell's "Dear Colleague Letters" of Oct. 5 & 6, 1978, which were part of a series of letters describing and commenting on the purposes of the Act that Rep. Dingell sent to Members of the House of Representatives.
 See also H.R.Rep. No. 96-938, supra note 11, at 4-5 (preventing price increases to high-priority consumer was just one purpose of incremental pricing).
 
 
 [24]
 Consider the following colloquy between Sen. Stone and Sen. Jackson:
 Mr. STONE. Section 204 provides that certain of the costs from some categories of natural gas will be passed through to industrial users until their natural gas acquisition cost reaches the price of the user's alternative fuel oil. Although the price of No. 2 fuel oil is to be used as the alternative fuel price, the bill provides authority for FERC to reduce the alternative fuel price to the price of No. 6 fuel oil if a pipeline, distribution company, or industrial user can establish that the price of No. 6 fuel oil is the appropriate fuel price to use. Do you agree that No. 6 fuel oil is to be used by the Commission as the alternative fuel price if a pipeline, distribution company, or industrial user can establish that it would use No. 6 fuel oil if natural gas is not available?
 Mr. JACKSON. My answer to the Senator's question is in the affirmative.
 ....
 Mr. STONE. Let me see if I can be absolutely clear on this point. If it is established that a particular user to whom gas is being priced incrementally uses No. 6 fuel oil when it is unable to receive natural gas, then gas to this user will be incrementally priced up to the price of No. 6 fuel oil and no further.
 Mr. JACKSON. That is clearly the intent of the conferees in the drafting of the incremental pricing provision.
 Mr. STONE. I thank the Senator from Washington for helping me further clarify the intent of the incremental pricing provision.
 
 
 [124]
 Cong. Rec. S16236 (daily ed. Sept. 27, 1978)
 
 
 [25]
 See note 10 supra
 
 
 [26]
 The proponents of the Act assured fellow legislators that taxpayers would not be subjected to enormous new administrative costs in implementing the incremental pricing program. See, e. g., colloquy between Sen. Percy and Sen. Jackson, 124 Cong. Rec. S15220-21 (daily ed. Sept. 15, 1978) ("How can we justify a huge buildup at the very time we are trying to shrink the bureaucracy?")
 See text at notes 10-12 supra (discussing complexity of the three-tier system). The record contains evidence that local oil prices within a region change frequently, often as much as two to three times a month, which compounds the difficulty and expense of managing an accurate three-tier system. E. g., comments of the American Gas Association, Item 14, at 7, Appendix at A-242 (Docket No. RM 79-21, April 12, 1978). See H.R.Rep. No. 96-938, supra note 11, at 10 (discussing volatility of No. 6 fuel oil price).
 
 
 [27]
 In addition to the administrative burden of calculating prices for the three-tier system there was widespread agreement among commenters that the time lag between collecting price data and the effective date of ceilings based on the data would pose a very serious problem. 44 Fed.Reg. at 57767-69 (Order No. 50, at 66-80) (discussing comments concerning time lag). As one commenter stated, the time lag problem "creates the potential situation where industrial users could pierce the alternative fuel level ceiling before the next posting of the alternative fuel price." If that happened, load loss would occur. Comments of the American Gas Association, supra note 26. See also H.R.Rep. No. 96-938, supra note 11, at 8 ("(D)elayed information could cause ceiling prices to be higher than actual No. 6 fuel oil prices. This technical problem is occurring now. The effect could be a greater shifting of industrial gas users to cheaper No. 6 residual fuel oil than had been intended by the statute.")
 
 
 [28]
 Thus we do not believe the Commission could legitimately do away with incremental pricing altogether by exempting all industrial users under section 206(d) from any surcharge