677 F.2d 531
 EAST TENNESSEE NATURAL GAS COMPANY, Petitioner (80-3461),
Intervenor (80-3624),
United Distribution Companies, Petitioner (80-3624),
Intervenor (80-3461),
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Process Gas Consumers Group, the American Iron & Steel
Institute, and theGeorgia Industrial Gas Group, Intervenors.
 Nos. 80-3461, 80-3624.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 26, 1982.
Decided May 10, 1982.
 
 C. William Cooper, Falmouth, Mass., J. Richard Tiano, Richard M. Merriman, John R. Schaefgen, Jr., Reid & Priest, Washington, D. C., for United Distribution Companies-intervenors.
 
 
 1
 William A. Sutherland, Sutherland, Asbill & Brennan, Washington, D. C., for the Process Gas Consumers Group, the American Iron & Steel Institute, and the Georgia Industrial Gas Group-intervenors.
 
 
 2
 Gregory Grady, Dale A. Wright, James T. McManus, Barbara J. Klein, Littman, Richter, Wright & Talisman, P. C., Washington, D. C., Thomas E. Midyett, Jr., General Attorney, East Tennessee Natural Gas Co., Knoxville, Tenn., for East Tennessee Natural Gas Co.
 
 
 3
 Jerome Nelson, Sol., Carol M. Lane, Federal Energy Regulatory Comm., Washington, D. C., Joanne Leveque, for Federal Energy Regulatory Commission.
 
 
 4
 Edward J. Grenier, Jr., Glen S. Howard, Sutherland, Asbill & Brennan, Washington, D. C., for intervenor, Process Gas Consumers Group, et al.
 
 
 5
 Before ENGEL and KENNEDY, Circuit Judges, and HILLMAN, District Judge.*
 
 
 6
 PER CURIAM.
 
 
 7
 Petitioners and Intervenors seek review of two unreported orders of the Federal Energy Regulatory Commission[1] in which the Commission adopted rules governing the exemption of "small existing industrial boiler fuel users" from incremental pricing pursuant to section 206 of the Natural Gas Policy Act of 1978 ("NGPA"), 15 U.S.C. § 3346. Two of the resulting rules are the subject of this appeal and are codified at 18 C.F.R. § 282.202(f) (defining "(i)n existence on November 9, 1978") and 18 C.F.R. § 282.202(g) (defining "average per day use" during the peak month of 1977). Also challenged is the sufficiency of the Commission's compliance with the notice and comment requirements of section 4(a) of the Administrative Procedure Act, 5 U.S.C. § 553(b), in promulgating the rules.
 
 
 8
 Because of shortages of natural gas supplies, Congress in Title I of the NGPA allowed the wellhead price of natural gas to rise. As an integral part of the statutory scheme, Title II of the NGPA provides that interstate pipeline companies pass these increases in wellhead prices on to the ultimate users of natural gas by means of a surcharge. 15 U.S.C. §§ 3341-48. This pass-through of cost increases is termed "incremental pricing" and continues until the cost of gas to the user equals the cost of substitute fuels. To reduce the immediate impact of deregulation on high priority users of natural gas, exemptions from incremental pricing are provided for residential, commercial and agricultural users.
 
 
 9
 As part of its effort to have large industrial users bear the initial brunt of the price increases, Congress established an interim exemption for "small industrial boiler fuel users" in section 206(a)(1) of the NGPA, and in section 206(a)(2) provided that the Commission shall promulgate rules for permanent exemption:
 
 
 10
 (2) Permanent exemption.-
 
 
 11
 (A) General rule.-Not later than 18 months after November 9, 1978, the Commission shall prescribe and make effective a rule providing for the exemption of any small industrial boiler fuel facility from the rule required under section 3341 of this title (including any amendment under section 3342 of this title to such rule).
 
 
 12
 (B) Definition.-For purposes of this paragraph, the term "small industrial boiler fuel facility" means any industrial boiler fuel facility in existence on November 9, 1978, that had an average per day use of natural gas as a boiler fuel during the month of peak use during calendar year 1977 which did not exceed the lesser of-
 
 
 13
 (i) 300 Mcf; or
 
 
 14
 (ii) such average daily rate of use during a month of peak use as the Commission determines in such rule is necessary to assure that the volume of natural gas estimated by the Commission to have been used for boiler fuel during calendar year 1977 by facilities which are exempted under this paragraph does not exceed 5 percent of the total volume of natural gas estimated by the Commission to have been used for boiler fuel transported by interstate pipelines and used during calendar year 1977 as a boiler fuel.
 
 
 15
 15 U.S.C. § 3346(a)(2).
 
 
 16
 Pursuant to this authority, the Commission issued a notice of proposed rulemaking,[2] received comments, and in Order No. 85 set out rules for the permanent exemption. As an initial matter, the Commission opted to define the term "small industrial boiler fuel facility" as follows:
 
 
 17
 (a) Statutory exemptions. In accordance with the provisions of sections 206(a), (b), and (c) of the NGPA, natural gas used for the following purposes shall be exempt from incremental pricing under this part:
 
 
 18
 (1) All gas used for boiler fuel by an industrial boiler fuel facility:
 
 
 19
 (i) Which was in existence on November 9, 1978; and
 
 
 20
 (ii) Whose average per day use of natural gas as a boiler fuel during the month of peak use during calendar year 1977 did not exceed 300 Mcf ....
 
 
 21
 18 C.F.R. § 282.203(a). Petitioners do not dispute the foregoing rule; rather, they object to two further definitional regulations which were promulgated in Order No. 85.
 
 
 22
 First, 18 C.F.R. § 282.202(g) defines "average per day use" during 1977 in a manner which the Commission, at least, conceived would alleviate the unusual problem which existed in 1977 when serious shortages of natural gas required the curtailment of normal supply:
 
 
 23
 "Average per day use of natural gas as a boiler fuel during the month of peak use during calendar year 1977" means the average daily use of natural gas as a boiler fuel, calculated by dividing the total boiler fuel use of natural gas in the month of peak use during calendar year 1977 by the total of: (1) The number of days in that month on which service was available at 100 percent of normal delivery level; and (2) the sum of the number of days in that month on which service was available at less than 100 percent of normal delivery level (which sum is computed by multiplying the number of days at each delivery level less than 100 percent of normal times the percentage of normal delivery level experienced on those days, and adding the products).
 
 
 24
 Second, 18 C.F.R. § 282.202(f) governs the application of the small boiler exemption to facilities that, although exempt because of their 1977 use, were later modified:
 
 
 25
 (f) "In existence on November 9, 1978," means that an industrial boiler fuel facility: (1) Possessed the installed lines, piping, regulators, meters and any other similar components necessary for that facility to have received and used natural gas on November 9, 1978; (2) was using, or had the installed capability to use, natural gas as a boiler fuel on November 9, 1978; and (3) is essentially the same facility as to burner input or boiler capacity when it is being reviewed under this paragraph as it was on November 9, 1978.
 
 
 26
 In Order No. 85B, the Commission granted a rehearing of Order No. 85 but denied the exceptions raised by the parties. This appeal followed.
 
 
 27
 Both East Tennessee and United Distribution urge that the Commission exceeded its authority in promulgating a definition of "average per day use" in 18 C.F.R. § 282.202(g). They claim that the phrase "average per day use" is clear and unambiguous and, thus, does not call for any interpretation by the Commission whatever. Those petitioners also assert that the meaning of the term "use" in 18 C.F.R. § 282.202(g) is different from, and hence inconsistent with, the Commission's application of "use" elsewhere in the statute. Rather than making the exceptions more equitable, the rule imposes upon petitioner and others similarly situated an administrative burden of complying with a rule which is vague; this burden, they argue, would be excessively expensive for small industrial users. In essence, they assert that the definition represents an unjustified effort on the Commission's part to legislate a reduction in the breadth of the small boiler exemption of section 206(a)(2) in a manner neither intended nor authorized by the Congress.
 
 
 28
 Examining the language of the statute, we do not agree that the words "average per day use" are so definite and explicit as to preclude further fine-tuning by the Commission's rules.[3] While under one plausible interpretation the Commission should divide the amount of natural gas used by the number of days in the month, Congress did not indicate that all days of the month should be counted in making the calculation. Under the Commission's rule, "average per day use" is calculated by dividing actual use[4] by the number of days of the month when the boiler's fuel supply was not curtailed. When there was partial curtailment, only a fraction of that day is counted.[5] This calculation may not be as simple or straightforward as a pure arithmetic average, which would include each day of the month regardless of supply curtailment; but the incremental pricing system set up by Congress under the NGPA is inherently complex. It certainly should not be surprising that some portions of the incremental pricing program would entail the use of formulae that at first glance appear difficult to apply. The complex nature of the provisions suggests that words such as "average" may be subject to further definition and refinement.[6] From the face of the statutory language, we cannot conclude that the definition of "average per day use" in 18 C.F.R. § 282.020(g) is inconsistent with section 206(a)(2) or other sections of the NGPA.
 
 
 29
 Because the Supreme Court "has firmly rejected the suggestion that a regulation is to be sustained simply because it is not 'technically inconsistent' with the statutory language," United States v. Vogel Fertilizer Co., --- U.S. ----, ----, 102 S.Ct. 821, 828, 70 L.Ed.2d 792 (1982), we must also look to the statutory scheme and legislative history to determine whether the regulation is consistent with the statute's purpose. By permanent exemption of small industrial boilers, Congress intended to shield small boilers from some of the impact of the increase of wellhead prices created by Title I of the NGPA. Under section 206(a)(2) Congress instructed the Commission to create a permanent exemption based upon the levels of usage during 1977, a year of high curtailment. Through its rule, the Commission attempts to eliminate the effect of 1977 curtailment in making the exemption determination. Keeping in mind that Congress enacted the NGPA for the purpose of eliminating curtailment, we believe that the Commission's approach is not inconsistent with a fair and even-handed application of the NGPA. Congress was concerned that small users might not be able to withstand the price increases from incremental pricing. We find no similar concern for larger users whose boilers temporarily had small usage during 1977 due to supply curtailments that were later eliminated as a result of the NGPA.[7]
 
 
 30
 Further, the legislative history to the NGPA shows that Congress intended to give the Commission wide latitude in prescribing rules:
 
 
 31
 The conferees recognize that implementation of this (incremental pricing) program will be complex. The conference agreement provides for implementation of incremental pricing by rule, which is intended to give the Commission the requisite discretion to deal with difficulties that may arise.
 
 
 32
 Conference Report to accompany H.R. 5289, H.R.Rep.No. 95-1752, 95th Cong., 2d Sess. 95 (1978), reprinted in (1978) U.S.Code Cong. & Ad.News, Vol. 7, p. 9012 (emphasis added).[8] In light of this strong Congressional policy to defer to the Commission, the court is of the opinion that the Commission's rule codified at 18 C.F.R. § 282.202(g) is within the Commission's authority granted under the NGPA.
 
 
 33
 United Distribution, in challenging the definition of "in existence on November 9, 1978" in 18 C.F.R. § 282.202(f), asserts that by that regulation the Commission encourages users of natural gas to build new boilers at different sites rather than to choose the more economical means of enlarging already existing sites. In other words, the petitioner argues basically that once a small boiler facility, in existence on November 9, 1978, has been shown to be exempt because of 1977 use of fuel it remains exempt from any incremental pricing, regardless of additional boiler capacity later added at the same site.
 
 
 34
 For reasons similar to those presented in the discussion of the "average per day use" rule, we conclude that the Commission's definition of "in existence" is a valid exercise of its authority. There is sufficient ambiguity in the phrase "in existence on November 9, 1978" to permit clarification regarding the effect of changes made at a given site. The Commission's rule treats an entire site as one facility. By doing so, it is not inconsistent with Congress' purpose of exempting truly small boilers and is within the broad scope of rule-making authority evidenced in the legislative history. Although petitioners argue that the Commission's rule will cause unfavorable economic results, our task is not to determine whether the Commission chose the best possible rule, but instead whether the Commission's choice is within the authority granted under the NGPA. We conclude that it is.
 
 
 35
 Finally, we believe that the Notice of Proposed Rulemaking sent out by the Commission satisfied the requirements of the Administrative Procedure Act and fully informed the parties of the nature of the rules being considered by the Commission. While parts of the final rules may have come from comments submitted to the Commission, new notice was not thereby required.[9]
 
 
 36
 Accordingly, the respective petitions are denied.
 
 
 37
 CORNELIA G. KENNEDY, Circuit Judge, concurring in part and dissenting in part.
 
 
 38
 I agree with the majority that petitioners received adequate notice of the proposed rules here. I also concur in that part of the majority's opinion upholding the Federal Energy Regulatory Commission's definition of "facility in existence on November 9, 1978." Congress explicitly required the Commission to define the word "facility" in section 201(c)(1) of the Natural Gas Policy Act (NGPA). The Commission exercised that power in a reasonable fashion, defining "facility" to mean all boilers at a work-site instead of individual boilers. If a "facility" was changed after November 9, 1978, either by adding or subtracting boilers, it is no longer the facility that was in existence on November 9, 1978.
 
 
 39
 I respectfully dissent from the part of the majority opinion upholding the Commission's definition of "average per day use" of natural gas. As I understand the majority, it reasons that "average per day use" is an ambiguous phrase the Commission is capable of "fine-tuning." The majority holds that the Commission reasonably "fine-tuned" the phrase by measuring a "day" with respect to the availability of natural gas rather than with respect to the usual 24 hours. The majority supports its conclusion by noting that because the NGPA is a complex statute otherwise clear words such as "average" and "day" may not be what they seem at first glance; the Commission has broad discretion under the NGPA incremental pricing provisions; the statutory language and legislative history of the NGPA do not expressly contradict the Commission's interpretation; and the Commission's rule is fair, even-handed, and furthers Congress' intent to exempt only small boilers from incremental pricing.
 
 
 40
 I cannot accept the majority's analysis or conclusion for several reasons. First, I am unable to find that the Commission had authority to define "average per day use." The Commission acted pursuant to section 501(b) of the Act, 15 U.S.C.A. § 3411(b), which authorizes it to define "accounting, technical, and trade terms" used in the Act. Neither the phrase "average per day use" nor the word "day" can be considered technical, trade, or accounting terms, even when used in a complex statute.* Thus, section 501(b) cannot be the source of power for the Commission to define "average per day use." "(A)n administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." S.E.C. v. Chenery Corp., 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943), quoted in Industrial Union Dept. v. American Petroleum Institute, 448 U.S. 607, 631 n.31, 100 S.Ct. 2844, 2858 n.31, 65 L.Ed.2d 1010 (1980); see also Ohio Ass'n of Community Action Agencies v. F.E.R.C., 654 F.2d 811, 817-818 (D.C.Cir.1981). Our limited power to review agency action requires that the Commission be reversed.
 
 
 41
 Even assuming the Commission had power to define "average per day use" under section 501(b), the Commission's definition, far more than a "fine-tuning," is not a reasonable construction of the language of section 206(a). "(T)he plain, obvious, and rational meaning of a statute is to be preferred to 'any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover.' " Community Blood Bank of Kansas City Area, Inc. v. F.T.C., 405 F.2d 1011, 1015 (8th Cir. 1969). To an ordinary mind, "average per day use" means total use divided by number of days. An ordinary mind would not go about searching for hidden meaning in the word "days," finally concluding that a day is the period of time in which a facility would use the quantity of natural gas that it would have used in 24 hours if natural gas were 100 percent available. Congress could, if it chose, define average per day use as the Commission did. Since Congress did not, the phrase bears its ordinary meaning. Contrary to the majority's assertions, the Commission's definition is inconsistent with the ordinary meaning of section 206(a).
 
 
 42
 Early in the rulemaking proceeding the Commission was of the view that it did not have "authority to revoke the statutory exemption apparently provided" in section 206(a) to large boilers that had not used much fuel in 1977. The Commission ultimately used section 501(b) to remedy this perceived potential inequity. The tortured definition of "average per day use" we have here is the result.
 
 
 43
 (N)ot infrequently administration reveals gaps or inadequacies of one sort or another that may call for amendatory legislation. But it is no warrant for extending a statute that experience may disclose that it should have been more comprehensive.... For the ultimate question is what has Congress commanded, when it has given no clue to its intentions except familiar English words and no hint by the draftsmen of the words that they meant to use them in any but an ordinary sense.
 
 
 44
 Addison v. Holly Hill Fruit Products, 322 U.S. 607, 617-618, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488 (1944). The majority may be correct that the Commission's rule is "fair." The trouble is that it is not what Congress commanded.
 
 
 45
 The majority relies on the fact that Congress did not specify that "days" referred to 24 hour periods, either in the statute or the legislative history, so there is nothing to contradict the Commission's interpretation. Congress' failure to further define such a clear word cannot be support for the reasonableness of the Commission's highly unusual definition. We should rejoice on those occasions when Congress uses plain words to manifest its intent, not allow administrative agencies to subordinate Congress' intent to their own. The NGPA assuredly contains complex provisions, and the Commission may certainly address those complexities. It does not follow that the Commission has the same broad discretion when administering those parts of the NGPA that are clear, and "average per day use in the month of peak use" was clear until the Commission made it otherwise.
 
 
 46
 As the majority notes, Congress meant through section 206(a) to exempt small, not large, industrial boiler fuel users of natural gas from incremental pricing. This was not the only congressional concern, however. The legislative history shows that Congress was also concerned that the NGPA was too complex, that it would be a regulatory nightmare. Ohio Ass'n of Community Action Agencies v. F.E.R.C., supra, 654 F.2d at 820-824, and accompanying footnotes. There is no reason to reject the simple rule passed by Congress for deciding what was a small industrial boiler and what was not. Records that show how much gas industrial boilers used in each month of 1977 already exist and are easily accessible, so computing actual average per day use would be very straightforward. The virtues of such simplicity, in terms of reduced costs of administration and compliance, are obvious.
 
 
 47
 The Commission's rule deletes those virtues from section 206(a). The Commission's "average per day use" depends on measuring deviations from the "normal delivery level," but nowhere does the Commission explain how to find a "normal" delivery level. Petitioners argue that their records do not show the extent to which individual facilities were subject to curtailment and the Commission does not contradict this. No records show which boiler facilities responded to curtailment by asking for more gas than they otherwise would, thereby receiving a "normal" delivery level even during curtailment. No records are easily available to show when delivery level was below normal during times of curtailment for reasons unrelated to the curtailment, such as labor problems, raw material supply problems, lack of consumer demand, or mechanical difficulties. The costs of resolving any of these questions will be high, and the Commission's rule may well be impossible to apply.
 
 
 48
 To be sure, one may pay a price for simplicity. In this case Congress's language might result in some large industrial boilers being exempted from incremental pricing, because their average per day use of natural gas during the month of peak use in 1977 might have been reduced by any one of a number of factors. The clear mandate of section 206(a) demonstrates that Congress decided the danger of some large boilers slipping through the cracks was a price worth paying for an easily administered rule that gave the right result most of the time. Indeed, the price Congress paid for its simple rule might be very small. The Commission notes in its brief that few large users of natural gas were curtailed throughout 1977.
 
 
 49
 Underlying the Commission's desire to deviate from Congress' clear language in section 206(a) appears to be the assumption that, had Congress thought about the problem of year-long gas curtailment in 1977, it would not have passed the law that it did. Congress' thoughtfulness, or lack thereof, does not alter the Commission's inability to amend the statute, but I doubt that the Commission is correct. Congress was acutely aware of the 1977 curtailments of natural gas. They were the impetus for the NGPA.
 
 
 50
 For all of these reasons, I find the Commission's rule inconsistent with the language and policy of section 206(a). I also find the Commission's definition of "average per day use" arbitrary. Section 206(a)(2)(B)(ii) required the Commission as a preliminary matter to determine whether a 300 Mcf ceiling on the "average daily rate of use during a month of peak use" during calendar year 1977 would result in the small boiler exemption applying to more than 5 percent of the total volume of natural gas used as a boiler fuel in 1977. In discharging this function, the Commission used 24 hour days and calendar months. Then, section 206(a)(2)(B) states that a "small boiler" is one with "an average per day use of natural gas as a boiler fuel during the month of peak use during calendar year 1977" of not more than 300 Mcf (emphasis added). In determining the "month" of peak use the Commission sensibly used ordinary calendar months. It did not calculate what would have been the month of peak use had there been no gas curtailment in 1977. However, when it came time to interpret "average per day use" the Commission suddenly departed from a straightforward calendar-based analysis to define a day in terms of normal delivery level. It is arbitrary to treat these very similar statutory provisions so differently unless there is explicit support for doing so, and there is none. The arbitrary definition of months and days is another ground requiring reversal.
 
 
 
 *
 Hon. Douglas W. Hillman, Judge, United States District Court for the Western District of Michigan, sitting by designation
 
 
 [1]
 Order No. 85 (issued May 8, 1980) and Order No. 85-B (issued July 3, 1980) in FERC Docket No. RM80-24, Permanent Rule Defining Small Existing Industrial Boiler Fuel Users Exempt From Incremental Pricing Under The Natural Gas Policy Act of 1978
 
 
 [2]
 Notice of Proposed Rulemaking (March 6, 1980) in FERC Docket No. RM80-24
 
 
 [3]
 Section 501(b) of the Act provides in part, "the Commission is authorized to define, by rule, accounting, technical, and trade terms used in this chapter." 15 U.S.C. § 3411(b). Although the dissent questions this, we have little doubt that the phrase "average per day use" is an "accounting" term under section 501(b). The calculation of "average per day use" involves an analysis and summary of the business operations of regulated users. Such a determination falls squarely within the meaning of "accounting" and does not stretch section 501(b) to allow the definition of any word in the NGPA, as feared by the dissent
 
 
 [4]
 By employing "actual use" the Commission is consistent with its treatment of "use" throughout section 206 of the NGPA
 
 
 [5]
 The following figures show how curtailed days are treated under the rule:
 Assume that a Facility used 6000 Mcf during its peak month of 1977 and experienced 100 percent delivery level for 10 days and 50 percent of its normal level during 20 days. Under § 282.202(g), the average per day use for this Facility would be calculated as follows:
 Total Actual Use = 6000 Mcf
------------------------------------------- -----------------------------
Sum of (Days x Fraction of Normal Delivery) (10) (1.0) k (20) (0.50) days
 = 6000 Mcf
 --------
 20 days
 = 300 Mcf/day
 
 
 [6]
 The dissent contends that the definition of "average per day use" set forth by the Commission is not the same as the phrase's ordinary meaning and, hence, is inconsistent with the statute. It should be noted, however, that "the plain meaning rule is 'rather an axiom of experience than a rule of law ....' " Watt v. Alaska, 451 U.S. 259, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981). To determine Congress' intent, we believe that the meaning of "average per day use" must be determined with an eye to the problems of practical application. The question that arises in application of the statute is whether curtailed days should be counted the same as days without curtailment. Because the resulting exemption applies to years after 1977, years without curtailment, the Commission's rule resolves this question in a rational way and is not so curious or hidden as to be deemed inconsistent with the NGPA. We are also mindful that "regulations promulgated by the government body responsible for interpreting or administering a statute are entitled to great respect ...." Ford Motor Credit Co. v. Cenance, 452 U.S. 155, 101 S.Ct. 2239, 2241 n.3, 68 L.Ed.2d 744 (1981)
 
 
 [7]
 We have neither found nor been cited to any portion of the legislative history that indicates Congress intended an arithmetic average without regard for temporary curtailment of supply
 
 
 [8]
 See also Petrolite Corp. v. FERC, 667 F.2d 664, at 668 (8th Cir. 1981); Ohio Ass'n of Community Action Agencies v. FERC, 654 F.2d 811, 822-23 (D.C.Cir.1981)
 
 
 [9]
 See International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 478 F.2d 615, 632 n. 51 (D.C.Cir.1973)
 
 
 *
 To hold that using ordinary words in a complex statute makes them "technical, trade, or accounting terms" would amount to an amendment of section 501(b). It would authorize the Commission to define every word in the NGPA